236 So.2d 388 (1970)
Johnnie B. SEALS, Father and Next Friend of Johnny Wayne Seals, a Minor
v.
ST. REGIS PAPER COMPANY and Harold W. Smith.
ST. REGIS PAPER COMPANY and Harold W. Smith
v.
Johnnie B. SEALS, Father & Next Friend of Johnny Wayne Seals, a Minor.
No. 45827.
Supreme Court of Mississippi.
May 25, 1970.
Rehearing Denied July 2, 1970.
*389 Cumbest, Cumbest & Shaddock, Pascagoula, for Seals.
M.M. Roberts, Hattiesburg, for St. Regis.
INZER, Justice.
This is a personal injury suit filed in the Circuit Court of George County on behalf of Johnny Wayne Seals, a minor, with a demand of $50,000 actual damages and $50,000 punitive damages. There was a resulting jury verdict of $25,000. On appeal to this Court we reversed the trial court, holding that under the facts then before the Court the case was not a proper one for the authorization of punitive damages. St. Regis Paper Co. v. Seals, Miss., 211 So.2d 547 (1968).
After the case was remanded to the circuit court, the court sustained a motion of appellee over the objection of appellant to amend his declaration to charge newly-discovered evidence and to seek actual damages in the amount of $400,000 and punitive damages in the amount of $200,000. Another jury trial resulted in a jury verdict awarding appellant $200,000 actual damages. The trial court sustained a motion for a new trial and ordered a new trial on the question of damages alone. From this order Johnny Wayne Seals appeals and appellees cross appeal.
Since the jury resolved the conflict in the evidence in favor of appellant, we will state the facts in the light most favorable to him. Johnny Wayne Seals was injured on May 10, 1966, when he was struck by an automobile driven by Smith in the course of his employment with St. Regis Paper Company. The accident happened at about *390 3:00 p.m. on U.S. Highway 98 about four miles east of Lucedale. Johnny was fourteen years of age at that time and a seventh grade student at Rocky Creek School in Lucedale. He was a passenger on a school bus and was returning home from school. His home was on the north side of the highway and when the bus reached a point opposite his home, it stopped to let him off. When the bus stopped, it had out the required stop sign and the required lights were blinking. A transport truck loaded with farm tractors was following the school bus and it stopped about thirty feet behind the bus. The transport truck was fifty-five feet long and the school bus was about forty-five feet long. At least one other car stopped behind the transport truck. The flag boy and Johnny got off the bus and the flag boy went to the center of the highway where he held out the flag. There was a car approaching from the east and the flag boy and Johnny were watching the car to see if it was going to stop. After the flag boy had held out the flag for about twenty-five or thirty seconds, Johnny started across the road and he was struck by the front of the automobile driven by Smith. The force of the blow knocked Johnny about twenty feet into the air and about thirty feet to the right of where he had been struck.
Smith's version of the accident was that he could not see the school bus because of the transport truck and when the truck stopped, he pulled into the north lane to pass him. He estimated his speed as from thirty to thirty-five miles per hour. He stated that he was passing the truck when he saw yellow and immediately applied his brakes and blew his horn; that just as the front part of his car got past the school bus Johnny ran into the right front fender of his car. He said that the flag boy tried to stop Johnny, but Johnny walked into the side of his car and it threw him back, but did not knock him into the air. He admitted that he paid a fine for passing the school bus, but explained that the reason he did so was that the justice of the peace told him that technically he was guilty of passing a school bus although he was attempting to stop.
As a result of the accident Johnny suffered lacerations of the scalp, a break in the front of his pelvis bone, multiple abrasions on his body, and a laceration of the right buttock. He was carried to the George County Hospital where he was treated by Dr. Dayton Whites. The x-rays showed a slight displacement at the fracture site of the pelvis bone and there was some separation. Dr. Whites testified that it was necessary to use a catheter on Johnny for approximately five days and that this was painful. Johnny remained in the hospital for twenty-two days and during this time he required medication for pain. After he was discharged from the hospital, Dr. Whites did not see him again until the day of the trial. At that time he examined him and found some tenderness in his back, atrophy of the right leg, and an abnormal gait which caused callouses on his feet. It was Dr. Whites' opinion that Johnny had recovered as much as he was going to recover and that because he was still having pain in the back that this would continue to cause him trouble in the future.
On July 26, 1968, Johnny was examined by Dr. E.J. Holder of Laurel an orthopedic surgeon for the purpose of evaluation. Dr. Holder testified that he had the benefit of the x-rays which were taken on the day of the accident and that these x-rays revealed a complete fracture. Johnny gave him a history of persistent pain in his low back region primarily on the left and of trouble with his feet. After examination Dr. Holder found healed fractures of the superior and inferior ramus of the left pubis with sacroiliac sprain on the left, congenital deformities of both big toes, abnormal gait with callouses on both toes. It was his opinion that as a result of the fracture stress had been applied to the sacroiliac joint causing it to give or stretch. It was further his opinion that this condition was consistent with low back pain and that the *391 the opinion that due to the stress and strain injury was permanent. He was also of of the joint Johnny's gait had changed causing callouses on his feet, and that any undue stress on the joint would cause more pain and more disability. He said that he would not recommend Johnny participating in sports, such as football, basketball and baseball. On cross examination Dr. Holder stated in answer to a question in regard to future disability that:
Well, the main thing he will have is pain, he's not going to do any more damage, I'd say, unless he sustains another fall or injury such as he has had already, but the biggest difficulty he is going to have is pain and discomfort, and over a long period of time I think he will have more degenerative arthritic changes in the joint if he applies undue stress to it.
Johnny's mother testified that after Johnny returned home from the hospital that he was confined to home for a month or two. She said that before the accident Johnny's physical condition was good except that he had a broken arm at the time of the accident and that his arm was in a cast. She said the cast was put on his arm by a doctor in Mobile who removed it after Johnny was released from the hospital. She said after the accident she observed abnormalities in his gait and that he is now unable to participate in sports. She said Johnny had tried to work some but when he did it resulted in pain in his back.
Johnny testified that he did not recall what happened after he started across the road on the day in which he was injured. When he regained consciousness he was in the hospital and was in severe pain. He said while in the hospital he had to lie flat on his back and his back and hip hurt all the time. He described the catheter procedure as being very painful. He stated that since the accident when he tried to play basketball or baseball and when it was necessary for him to run his back and hips hurt. He also said that he had tried to work during the summer loading hay and picking corn and that this work caused such pain in his back and hips that he had to quit work.
The proof on behalf of appellees and cross appellants showed that the next winter after the accident Johnny did play basketball on the Rocky Creek School team. This school includes grades one through eight and the basketball team was made up of seventh and eighth grade students. The school annual shows Johnny as being a member of the seven man squad during the year 1967-68.
Inasmuch as appellees-cross appellants raised a question as to their liability we will first consider the errors assigned on cross appeal. They assign as error the refusal of the trial court to grant their motion for a peremptory instruction to direct the jury to find for them. It is argued that Smith was met with a sudden emergency and that he did all that he could to avoid the accident. Cross appellants did not raise this affirmative defense in their answer and furthermore it is only when there is no conflict in the evidence as to the emergency that it ever becomes a question of law to be determined by the court. It cannot be said that there is no conflict in the evidence on this point. If Smith desired to take advantage of this affirmative defense, he was required by the provisions of Section 1475.5, Mississippi Code 1942 Annotated (1956) to set out such affirmative matter in his answer, otherwise, such matter could not be proved at the trial. Myrick v. Holifield, 240 Miss. 106, 126 So.2d 508 (1961).
Cross-appellants also contend that the trial court was in error in failing to order a new trial on the question of liability. It is argued that the court was in error in allowing Seals to amend his declaration to ask for $200,000 punitive damages after we had held that the facts in the record in the former trial did not justify punitive damages instruction. It is well settled that when a judgment or decree appealed from is reversed by this Court and is remanded *392 to the trial court for the purpose of having a trial de novo, the trial court has the power to allow amendments to be made to the pleadings just the same as it had power to allow amendments before the judgment or decree appealed from was rendered. Armstrong v. Jones, 198 Miss. 627, 22 So.2d 7 (1945); Haines v. Haines, 98 Miss. 830, 54 So. 433 (1910). Furthermore, the trial court instructed the jury that it could not award punitive damages in this case, and we are unable to see how appellant was prejudiced in any way by allowing the amendment to the declaration. The trial court did not abuse its discretion in allowing the amendment.
It is contended that the trial court admitted incompetent evidence to the prejudice of cross-appellants. The principal argument in this respect is that on cross-examination Smith, an adverse witness, was questioned by the Court, over the objection of cross-appellants, relative to whether he had pled guilty to the charge of unlawfully passing the school bus on the occasion in question. They seem to complain more about the observation of the trial judge and the argument of counsel on this point than the admission of testimony. Kelly v. King, Miss., 196 So.2d 525 (1967) is controlling on the admission of this testimony. There we held a plea of guilty in a criminal case is admissible in a civil suit growing out of the same offense as an admission against interest. Of course, the defendant has a right to explain the reason for such plea which Smith did in this case.
Cross-appellants next complain that counsel for Seals made use of leading questions to which objections were overruled. We have considered the instances specifically pointed out and we find no reversible error in this regard. The rule is that the trial court, in its discretion, may allow leading questions, and unless there has been abuse of this discretion to the prejudice of the complaining party it is not reversible error. Summerville v. State, 207 Miss. 54, 41 So.2d 377 (1949).
We have carefully examined the other assignment of errors relative to improper instructions and improper argument of counsel for Seals, and we find no reversible error in this regard. There being no reversible error, we affirm as to liability.
Seals argues two propositions on direct appeal in support of his contention that the trial court was in error in setting aside the verdict of the jury and ordering a new trial on the question of damages. It is first argued that the evidence on the second trial was materially different from that of the first trial and that the trial court should have granted a punitive damage instruction. Appellant indicates by his argument that the verdict of the jury should be upheld because under the facts of the case the jury had a right to impose punitive damages. While the evidence relative to the degree of negligence of Smith is stronger on this trial than it was on the first trial, we do not think that this was a case for the imposition of punitive damages. Punitive damages may be recovered for a willful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong. Smith was not guilty of willful or intentional wrong, and we do not think that his course of conduct was such as discloses a reckless indifference to the consequences of his act without any substantial effort to avoid the accident.
The second proposition argued is that there was no plea of contributory negligence in this case and that the trial court was manifestly wrong in granting a new trial without finding that the verdict of the jury was so excessive as to evidence bias, passion and prejudice on its part. In Dendy v. City of Pascagoula, 193 So.2d 559 (Miss. 1967), this same argument was made and there we said:
The fact that the trial judge did not specifically state that the verdict of the jury was so large that it evidenced bias, passion or prejudice on the part of the jury does not necessarily mean that he *393 did not reach that conclusion. The trial judge is presumed to know the law and he is presumed to have correctly applied it in passing on the motion for a new trial. (193 So.2d at 563).
We also said:
We have consistently held in a long line of cases that this Court, in considering the action of the trial court in passing on a motion for a new trial will consider the action with favor and support it unless it is manifestly wrong. Especially is this true where a new trial has been granted, since the rights of the parties are not finally settled at this point. We will not disturb such action unless it is a manifest abuse of discretion. Capital Transport Co., Inc. v. Segrest, 254 Miss. 168, 181 So.2d 111 (1965); Rayner v. Lindsey, 243 Miss. 824, 138 So.2d 902 (1962); Long v. Magnolia Hotel Co., 236 Miss. 655, 111 So. 645, 114 So.2d 667 (1959); Harper v. Miss. State Highway Commission, 216 Miss. 321, 62 So.2d 375 (1953); Smith v. Walsh, 63 Miss. 584 (1886). (193 So.2d at 564).
We are of the opinion that this case should be affirmed on direct appeal. However, appellant has requested in this event that in order to save time, expense and further litigation that he be given an opportunity to accept a remittitur. Since two juries have found that appellees were liable for the injuries suffered by Seals, we are of the opinion that appellants should be afforded the opportunity of accepting a remittitur. Therefore, this case will be affirmed on direct appeal unless the appellants shall within fifteen days after final judgment enter a remittitur of $125,000. In the event a remittitur is entered, a judgment in favor of Seals will be entered here for $75,000.
Affirmed on direct and cross appeals and remanded for a new trial on the question of damages unless the specified remittitur is entered.
ETHRIDGE, C.J., and RODGERS, JONES and BRADY, JJ., concur.